**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | |
|---|---|
| RANDELL E. POTTS,<br><br>              Plaintiff,<br><br>              v.<br><br>TRANSAMERICA LIFE INSURANCE<br>COMPANY,<br><br>              Defendant. | CAUSE NO.: 4:23-CV-24-TLS |

### OPINION AND ORDER

This matter is before the Court on Defendant Transamerica's Renewed Motion for

Summary Judgment [ECF No. 44]. For the reasons set forth below, the Court GRANTS in part

and DENIES in part the motion for summary judgment.

### BACKGROUND

Plaintiff Randell E. Potts filed a Complaint [ECF No. 6] in the Jasper County, Indiana,

Superior Court, on February 7, 2023, alleging claims against Defendant Transamerica Life

Insurance Company for breach of contract (Count I), violation of the Indiana Consumer Fraud

Protection Act (Count II), and bad faith breach of an insurance contract (Count III). The claims

arise out of the November 2022 termination of a life insurance policy issued to the Plaintiff in

1990 notwithstanding the Plaintiff's alleged remittance of the requisite payments throughout

2022.

On March 8, 2023, the Defendant removed the case to this Court based on diversity

jurisdiction. ECF No. 1. On April 18, 2023, on the Defendant's motion and with no objection

from the Plaintiff, the Court dismissed Count II of the Complaint brought under the Indiana

Consumer Fraud Protection Act. *See* ECF Nos. 9, 17, 18. Counts I and III remain pending.

### MATERIAL FACTS

As an initial matter, both parties failed to comply with Northern District of Indiana Local

Rule 56-1 on summary judgment procedure, which became effective February 25, 2022.

As to the moving party's obligation, Local Rule 56-1(a) provides, in relevant part:

> **(a)** **Moving Party's Obligations**. A party moving for summary judgment must *separately* file:
>
> **(1)** a motion;
>
> **(2)** a supporting brief; [and]
>
> **(3)** a *Statement of Material Facts* with *numbered paragraphs for each material fact* the moving party contends is undisputed which includes:
>
> > **(A)** *a short statement of each fact*; and
> >
> > **(B)** *a citation to evidence supporting each fact* . . . .

N.D. Ind. L.R. 56-1(a) (emphasis added). While the Defendant separately filed a "Statement of

Material Facts Not in Dispute,"[1] the Defendant did not include "numbered paragraphs for each

material fact." *See* ECF No. 46. Instead, the Defendant set out the facts in narrative paragraph

format under five lettered headings (A–D, F). *See id.* While there is a citation to evidence for

many sentences within those paragraphs, numerous sentences and the five headings have no

citation to evidence or contain commentary or argument. In addition, the Defendant included

new facts in both the Background and Argument sections of its Summary Judgment Brief that

were not included in the Statement of Material Facts Not in Dispute. *See* Def. Br. 2 (citing Ex. D,

---

[1] Southern District of Indiana Local Rule 56-1(a) requires the moving party to include in its brief a section labeled "Statement of Material Facts Not in Dispute." S.D. Ind. L.R. 56-1(a).

¶¶ 10–13, ECF No. 45-4), 7 (citing Ex. B at 23:18–24:12, ECF No. 45-2), ECF No. 45. And although the Defendant filed its "Statement of Material Facts Not in Dispute "as a separate document, *see* ECF No. 46, the Defendant also recited the "Statement of Material Facts Not in Dispute" verbatim in the body of its Brief in support of summary judgment, *see* Def. Br. 3–5, ECF No. 45.

As for the opposing party's obligations, Local Rule 56-1(b) provides, in relevant part:

**(b)**    **Opposing Party's Obligations**. A party opposing the motion must, within twenty-eight days after the moving party served the motion, *separately* file:

    **(1)**    A *response brief*; and

    **(2)**    a *Response to Statement of Material Facts* which includes:

        **(A)**    a verbatim restatement of the Statement of Material Facts;

        **(B)**    a correspondingly numbered response immediately following each paragraph of the Statement of Material Facts;

        **(C)**    *a citation to evidence supporting each dispute of fact*; and

        **(D)**    additional facts in *a section titled Additional Material Facts* with *numbered paragraphs* continuing the sequential numbering of the Statement of Material Facts *for each additional material* fact the opposing party contends is undisputed which includes:

            **(i)**    a short statement of each fact; and

            **(ii)**    *a citation to evidence supporting each fact*.

N.D. Ind. L.R. 56-1(b) (emphasis added).

The Plaintiff incorrectly filed a "Reply Motion" with a supporting "Brief and Reply," ECF Nos. 47, 48, rather than filing a "response brief"; did not file a "Response to Statement of Material Facts" as required by the current Local Rule 56-1(b)(2) but rather a "Statement of

Genuine Disputes (Appendix I)" under the prior local rule, ECF No. 48-6;[2] and also did not include an "Additional Material Facts" section within its separately filed "Statement of Genuine Disputes (Appendix I)," *id.*, but instead filed a "Verified Statement of Facts" within his response brief, Pl. Br. 2–5, ECF No. 48.

As for his response to the Defendant's Statement of Material Facts Not in Dispute, the Plaintiff could not technically comply with Local Rule 56-1(b)(2)(B) because the Defendant did not set out each fact in a separate numbered paragraph as required by Local Rule 56-1(a)(3). *See* ECF No. 46. The Court finds that the Plaintiff nevertheless complied with the spirit of the rule in his "Statement of Genuine Disputes (Appendix I)" because he provided a verbatim restatement of each of the Defendant's lettered paragraphs as required by Local Rule 56-1(b)(2)(A) and then provided his substantive response immediately following each lettered section with citations to evidence as required by Rule 56-1(b)(2)(B) and (C). *See* ECF No. 48-6. However, like the Defendant, the Plaintiff did not provide a citation to evidence for every fact statement in his response, which also includes commentary and argument.

And, like the Defendant's "Statement of Material Facts Not in Dispute," the Plaintiff's "Verified Statement of Facts" is in paragraph form rather than in numbered paragraphs for each material fact as required by Rule 56-1(b)(2)(D)(i) and has a citation to evidence of record for

---

[2] The prior version of Northern District of Indiana Local Rule 56-1(b) provided:
    **(b)**     **Opposing Party's Obligations.**
        **(1)**     ***Required Filings.*** A party opposing the motion must, within 28 days after the movant serves the motion, file and serve
            **(A)**     a response brief; and
            **(B)**     any materials that the party contends raise a genuine dispute.
        **(2)**     ***Content of Response Brief or Appendix.*** The response brief or its appendix must include a section labeled "Statement of Genuine Disputes" that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary.
N.D. Ind. Local Rules (effective Nov. 18, 2019), https://www.innd.uscourts.gov/sites/innd/files/LocalRules11182019.pdf (last visited June 20, 2025).

most sentences as required by Rule 56-1(b)(2)(D)(ii) but also contains numerous sentences with no citation to the record as well as improper commentary and argument. The Plaintiff's statement of fact was filed within the response brief, rather than separately.

Finally, Local Rule 56-1(c) provides:

**(c)**    **Reply.** The moving party may, within fourteen days after a response is served, separately file:

**(1)**    A reply brief; and

**(2)**    A Reply to Statement of Additional Material Facts which includes:

**(A)**    a verbatim restatement of the Statement of Additional Material Facts;

**(B)**    a correspondingly numbered response immediately following each paragraph of the Statement of Additional Material Facts; and

**(C)**    a citation to evidence supporting each dispute of additional fact.

N.D. Ind. L.R. 56-1(c)(2). With its reply brief, the Defendant filed a one-page "Reply to Statement of Additional Material Facts," noting the Plaintiff's failure to follow the procedural requirements of Local Rule 56-1(b) and stating: "Because there are no additional material facts to which [the Defendant] may reply, [the Defendant] files this short, non-substantive Reply solely to comply with its obligations under N.D. Ind. L.R. 56-1(c)(2)." ECF No. 49. In its reply brief, the Defendant argues that, because the Plaintiff failed to comply with the formatting requirements of Local Rule 56-1(b), the Defendant's "Statement of Material Facts Not in Dispute" should be deemed admitted. Def. Reply 2–3, ECF No. 50.

A failure to follow the Local Rules may result in the court not considering a party's fact statements or finding facts deemed admitted for purposes of summary judgment. *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("When a responding party's statement fails

to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion."); *Garcia v. Lowe's Home Ctrs., LLC*, No. 3:22-CV-928, 2024 WL 4723097, at *1 (N.D. Ind. Nov. 8, 2024) (recognizing the moving party's failure to file a statement of material facts in compliance with N.D. Ind. L.R. 56-1(a)(3)). However, district courts have discretion to overlook a failure to comply with local rules. *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011); *see also* N.D. Ind. L.R. 1-1(b) ("The court may . . . suspend or modify any rule in a particular case in the interest of justice.").

Here, both parties violated the formatting requirements of Local Rule 56-1. Thus, the Defendant's argument that its facts should be deemed admitted solely because of the Plaintiff's failure to comply with those requirements is not well taken. *See* Reply 2–4, ECF No. 50. In contrast with the cases cited by the Defendant, *id.*, the Plaintiff's filings demonstrate a concerted effort to identify material facts with supporting evidence in response to the Defendant's fact statement. Both parties provided citations to evidence of record for most of the material facts offered.

Therefore, the Court exercises its discretion to consider this motion on the merits based on the facts presented that are supported by the record. *See Stevo*, 662 F.3d at 887 ("These rules were not intended to provide a maze of technical traps to complicate and delay litigation without advancing the merits."). The Court disregards all statements contained within the parties' "statements of fact" that are not supported by a citation to evidence or that constitute commentary or argument. *See, e.g.*, *Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 716 (N.D. Ill. 2016) (explaining that arguments belong in the briefs, not the statements of fact); *Clifford v. Crop Prod. Servs., Inc.*, 627 F.3d 268, 273 n.6 (7th Cir. 2010) ("[S]tatements of lawyers are not evidence." (citing *United States v. Diaz*, 533 F.3d 574, 578 (7th Cir. 2008))). Counsel for both

6

parties are cautioned that a future failure to comply with Northern District of Indiana Local Rule 56-1 may result in facts being deemed admitted or not being considered.

**A.      The Policy**

In October 1990, Plaintiff Randell E. Potts, age 47, purchased a life insurance policy from Defendant Transamerica Life Insurance Company with a policy date of October 13, 1990, and a maturity date of October 13, 2038 (Policy). Ex. C, ECF No. 45-3, p. 5. The Policy has an "Initial Face Amount" of $25,000.00, a "Minimum Monthly Continuation Premium" of $34.02, and a "Current Planned Periodic Premium" of "$37.23 Payable to the Maturity Date." *Id.* The "Benefit" is listed as a "Flexible Premium Adjustable Life Insurance – Standard Non-Smoker Premium Class." *Id.*; *see also* Ex. D, ¶ 6 ("The Policy is a flexible premium, adjustable life insurance policy (also referred to as a Universal Life policy).").

The bottom of the first page of the Policy provides: "It is possible that coverage will expire prior to the maturity date chosen when either no premiums are paid following payment of the initial premium or subsequent premiums are insufficient to continue to such date." Ex. C, ECF No. 45-3, p. 5. The Plaintiff agrees that "[t]his notice is telling [him] that there is a possibility that [his] coverage will end before that maturity date." Ex. B, 14:7–12, ECF No. 45-2. At his deposition, the Plaintiff agreed that he does not "quite understand how this specific type of insurance policy works." *Id.* 14:23–15:1.

The fourth page of the Policy, which contains a chart of the "Minimum Nonforfeiture Values Based on the Planned Periodic Premium of $37.23 Payable Monthly," provides: "If the actual premium paid differs from the planned periodic premium or if a premium payment is skipped, the actual cash values will differ from those shown above. Values for durations not shown will be supplied on request." Ex. C, ECF No. 45-3, p. 8.

7

The Policy defines "Monthly Charge" as follows:

The Monthly Charge for a policy month is the sum of the following:
(a) The Cost of Insurance for the policy; and
(b) The cost of additional benefits provided by riders; and
(c) The Per Thousand Expense Charges multiplied by the number of thousands of Initial Face Amount or increase in Face Amount; and
(d) The Per Policy Expense Charge.

*Id.*, ECF No. 45-3, p. 11. The calculation for the "Cost of Insurance" is also explained. *Id.*

The "Premiums" section of the Policy provides:

**PREMIUM PAYMENT**
Planned Periodic Premiums for this policy are shown in the Policy Specifications. All premiums are payable in advance of the period to which they apply. . . .
. . .
Any time before the Maturity Date, you may:
(a) change the amount and/or the frequency of the Planned Periodic Premiums; and
(b) pay additional premiums.
Any change or payment of additional premium will be subject to our rules at the time of change of payment. We reserve the right to refuse acceptance of any premium payment which, if retained, would disqualify this policy as a contract of life insurance under any federal law. Any premiums paid in excess of such maximum shall be refunded.

**GRACE PERIOD**
If the Net Cash Value (Cash Value minus Loan Balance and any applicable Surrender Charge) on a Monthly Anniversary Day will not cover the Monthly Charge, the Policy will remain in force for a Grace Period of 61 days.
If a premium sufficient to cover the Monthly charge[sic] then due and the next Monthly Charge are not paid by the end of the Grace Period, your Policy will terminate without value. *We will mail you notice of the required premium when the Net Cash Value becomes insufficient*. If the Insured dies within the Grace Period, the Death Benefit will be reduced by the amount of the then required premium.
. . .

**REINTATEMENT**
We will reinstate this policy at any time within the five years from the date of lapse and prior to the Maturity Date if it has not been surrendered for its Net Cash Value. To reinstate this policy you must:
(a) present evidence of insurability satisfactory to us;
(b) pay a premium which is sufficient to keep the policy in force for two months; and

        (c) pay or reinstate any Loan Balance.
        . . .
        The effective date of a reinstated policy will be the Monthly Anniversary
Day on or next following the date we approve your application for reinstatement.

*Id.*, ECF No. 45-3, p. 9 (emphasis added).

Flexible premium adjustable life insurance policies differ from typical insurance policies where the insured pays a set premium at a set interval, usually monthly. Ex. D, ¶ 7. The Plaintiff understands that "under a flexible premium adjustable life insurance policy the insured can choose what amount of premium and the frequency of those payments so long as they meet the minimum premium payment amount required by the insurance company." Ex. B, 12:20–13:1; *see* Ex. D, ¶ 8. But to keep a flexible premium adjustable life insurance policy in effect, the insured must pay enough in premium to keep a positive cash value. Ex. D, ¶ 9. Policy owners may modify the amount and frequency of premium payments, so long as there is sufficient cash value in the policy to cover monthly deductions. *Id.* ¶ 10. If an insured does not pay adequate premiums to keep the cash value of the policy current, the policy lapses. *Id.* ¶ 11. While there is a grace period within which an insured may remit additional funds to reinstate the policy, if the policy has lapsed, the insured has no coverage. *Id.* ¶ 12. It is the responsibility of the insured to adjust the premium payment and frequency based on the policy's monthly deductions to determine what payment are required to keep the coverage in effect. *Id.* ¶ 13.

**B.**    **Communications and Payments**

On March 27, 2015, the Defendant prepared a Custom Life Insurance Illustration (Illustration) for the Plaintiff's Policy, which the Plaintiff read upon receipt. Ex. E, ECF No. 45-5; Ex. B, 18:10–11, 19:1–7. The Illustration provides updated information about the state of the Policy and the Policy's cash value. Ex. E at 4. The 2015 Illustration showed that the "Net Cash Value" of the policy would decrease every year while the Plaintiff continued to pay $37.23 in

monthly payments. *Id.* By year thirty-one of the Policy, when the Plaintiff reached age seventy-eight, the "Net Cash Value" of the Policy would be $0. *Id.* The Illustration provides: "Insufficient guaranteed fund value in year 31." *Id.* The thirty-first year of the Policy, which was issued in 1990, would be 2021. *See* Ex. B, 22:20–23:6.

In July 2021, the Plaintiff had received a "Notice of Payment Due" dated July 18, 2021, marked "Important – Final Notice," informing him: "Your life insurance has entered its grace period and is in danger of lapsing. In order to prevent your policy from lapsing, we must receive a minimum payment of $34.02 by 09/19/2021." Ex. 1, p. 1, ECF No. 48-1. The Defendant sent a follow-up letter dated August 23, 2021, regarding the grace period. Ex. 1, p. 3.

On September 24, 2021, the Plaintiff called the Defendant and was advised that the policy lapsed with a premium due date of July 13, 2021; the Plaintiff requested reinstatement information. Ex. 2, p. 4, ECF No. 48-2. In a letter dated October 1, 2021, the Defendant informed the Plaintiff that, "[i]n order to review this reinstatement we will need . . . [a] payment of $844.48," which was a $112.64 grace payment and $731.84 to pay the policy to 12/13/2021. Ex. 1, p. 5. The letter also advised: "Since the planned premium is less than the estimated cost of insurance, please request an updated illustration once the policy is back in force to determine the premium amount needed to keep the policy in benefit." *Id.* The Plaintiff wrote a check to the Defendant dated October 16, 2021, for $844.48, which was processed on October 25, 2021. *Id.* at 7.

The Plaintiff states that he requested an "updated illustration," as offered in the October 1, 2021 letter, but other than monthly premium statements, he received no updated illustration as to what the premium should otherwise be. Pl. Br. 2–3 (citing Ex. 4, ECF No. 48-4);[3] *see* Ex. 1, p.

---

[3] Exhibit 4 is the Plaintiff's affidavit, which avers: "I verify all facts as found in narration form [in the verified statement of facts] to be truthful and accurate."

5; Ex. 5, 44:16–23, ECF No. 48-5. When asked if he "[took] any action to increase [his] premium payments after receiving this notice," he testified that he called the Defendant "to know what premium I needed to pay to keep the insurance." Ex. 5, 39:8–40:20. When asked what the increased premium payment was, he responded, "They never told me. They kept sending me the same invoice, $37.23." *Id.* 40:19–23. The Plaintiff did not increase the amount of the monthly premium he paid, even though the Policy had a declining cash value, because the monthly invoice from the Defendant continued to be for $37.23 and did not show any additional amount owed. Ex. A, Request for Admission (RFA) Ans. 3, ECF No. 45-1; Ex. B, 40:21–41:3.

In early November 2021, the Plaintiff "requested and received a 'Universal Life Checkup' letter from [the Defendant]." Pl. Br. 3 (citing Ex. 4; Ex. 1, p. 7).[4] Also in early November 2021, a representative of the Defendant telephoned the Plaintiff and attempted to get him to update and amend his Policy to a new Policy. Pl. Br. 3 (citing Ex. 4). The agent was unable to answer the Plaintiff's questions as to why the existing Policy had lapsed, and what, if any, additional information was necessary or increase in premium was allegedly required to maintain the existing Policy. *Id.*

Every year in November, the Plaintiff received an annual report from the Defendant summarizing the Policy's cash value. Ex. B, 29:11–20; Ex. 1, p. 14. The annual report showed the cost of insurance every month from November 13 of the previous calendar year to October 13 of the current calendar year. Ex. B, 29:23–30:7; Ex. 1, p. 14. In November 2021, the Plaintiff received a "Universal Life Annual Report" (Annual Report), produced on 11-07-21, for the

---

[4] The Plaintiff cites page 7 of Exhibit 1, but page 7 is an image of the October 16, 2021 check for $844.48. However, page 11 of Exhibit 1 is a November 7, 2021 letter that provides: "Is your policy in 'good health'? You may not have reviewed or adjusted your policy recently, and that's why your Transamerica Premier Life agent needs to perform a Universal Life Checkup" and invites him to contact by phone a Transamerica Premier Life Representative to "talk about or schedule a review of your very important coverage." Ex. 1, p. 11.

Report Period of 10-13-20 to 10-13-21. Ex. 1, pp. 11–14; *see also* Ex. F. The Annual Report

provided the following table:

| MONTH ENDING | PREMIUM PAID | PREMIUM CREDIT DATE | DECLARED INT.RATE(%) | INTEREST EARNED | PREM EXP CHARGE | POLICY EXP CHARGE | COST OF INSURANCE | PARTIAL WITHDRAWAL | SURRENDER CHARGE | END OF MONTH CASH VALUE | LOAN BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11-13-20 | 37.23 | * | 4.50 | 3.80 | 2.42 | 4.00 | 153.38 | 0.00 | 0.00 | 924.82 | 0.00 |
| 12-13-20 | 0.00 | | 4.50 | 3.46 | 0.00 | 4.00 | 154.35 | 0.00 | 0.00 | 769.87 | 0.00 |
| 01-13-21 | 37.23 | * | 4.50 | 2.99 | 2.42 | 4.00 | 159.10 | 0.00 | 0.00 | 648.53 | 0.00 |
| 02-13-21 | 37.23 | * | 4.50 | 2.43 | 2.42 | 4.00 | 155.87 | 0.00 | 0.00 | 525.97 | 0.00 |
| 03-13-21 | 74.46 | * | 4.50 | 2.09 | 4.84 | 4.00 | 156.43 | 0.00 | 0.00 | 437.25 | 0.00 |
| 04-13-21 | 37.23 | * | 4.50 | 1.63 | 2.42 | 4.00 | 157.21 | 0.00 | 0.00 | 312.49 | 0.00 |
| 05-13-21 | 0.00 | | 4.50 | 1.15 | 0.00 | 4.00 | 158.44 | 0.00 | 0.00 | 186.14 | 0.00 |
| 06-13-21 | 37.23 | * | 4.50 | 0.73 | 2.42 | 4.00 | 159.11 | 0.00 | 0.00 | 58.59 | 0.00 |
| 07-13-21 | 731.84 | * | 4.50 | 0.22 | 43.57 | 4.00 | 155.83 | 0.00 | 0.00 | 583.25 | 0.00 |
| 08-13-21 | 0.00 | | 4.50 | 2.15 | 0.00 | 4.00 | 156.82 | 0.00 | 0.00 | 424.58 | 0.00 |
| 09-13-21 | 0.00 | | 4.50 | 1.58 | 0.00 | 4.00 | 157.82 | 0.00 | 0.00 | 264.32 | 0.00 |
| 10-13-21 | 0.00 | | 4.50 | 1.96 | 0.00 | 4.00 | 173.44 | 0.00 | 0.00 | 87.85 | 0.00 |
| TOTALS | 1,029.68 | | | 23.23 | 66.93 | 48.00 | 1,893.67 | 0.00 | 0.00 | | |

***IMPORTANT POLICYOWNER NOTICE***
YOU SHOULD CONSIDER REQUESTING MORE DETAILED INFORMATION ABOUT YOUR POLICY TO UNDERSTAND HOW IT MAY PERFORM IN THE FUTURE.
YOU SHOULD NOT CONSIDER REPLACEMENT OF YOUR POLICY OR MAKE CHANGES IN YOUR COVERAGE WITHOUT REQUESTING A CURRENT
ILLUSTRATION. YOU MAY ANNUALLY REQUEST, WITHOUT CHARGE, SUCH AN ILLUSTRATION BY CALLING 1-800-438-3080, OR WRITING:
TRANSAMERICA LIFE, 4333 EDGEWOOD RD NE, CEDAR RAPIDS, IA 52499-0001.
IF YOU DO NOT RECEIVE A CURRENT ILLUSTRATION OF YOUR POLICY WITHIN 30 DAYS FROM THE DATE OF YOUR REQUEST, YOU SHOULD
CONTACT YOUR STATE INSURANCE DEPARTMENT.

Ex. 1, p. 14. Just under this table is a "Notes" section that provides, in part:

> Assuming guaranteed interest, mortality and expense loads, the Policy's net cash surrender value will not maintain insurance in force until the end of the next reporting period unless further premium payments are made. Please contact your local office to discuss the options available to you to continue your coverage.

*Id.* As shown above, the "End of Month Cash Value" decreased each month from $924.82 in

November 2020 to $58.59 in June 2021. *Id.*

Subsequently, the Plaintiff received a "Billing Notice" reflecting all payments credited

through November 14, 2021, the last payment of $112.64 received on October 27, 2021, a "Due

Date" of "12/13/21," and a "Total Due" of "$37.23." Ex. 1, p. 15. A handwritten note on the

invoice shows that the Plaintiff sent check No. 5559 on 11-29-21.

In early December 2021, the Plaintiff received the following "Billing Notice" listing the

"date the last payment was received" as "02/07/22," a "Due Date" of "12/31/21," a "Total Due"

of "$37.23," and the statement: "This statement reflects all payments credited through:

06/02/22." Ex. 1, p. 18; Pl. Br. 3 (citing Ex. 4).



Ex. 1, p. 18. Yet the Defendant sent the Plaintiff a "Notice of Payment Due" dated December 14, 2021, indicating: "Your life insurance has entered its grace period and is in danger of lapsing. In order to prevent your policy from lapsing, we must receive a minimum payment of $34.02 by 02/12/2022." Ex. 1, p. 16. On December 21, 2021, the Plaintiff called the Defendant and was told the policy is current (confirmation number 993988). *Id.*; Pl. Br. 3 (citing Ex. 4); Ex. 2, p. 4.

In early January 2022, the Plaintiff received a "Billing Notice" listing the "date the last payment was received" as "02/07/22" for "$37.23," a "Due Date" of "01/13/22" for a "Total Due" of "$37.23," and the statement: "This statement reflects all payments credited through: 06/05/22." Ex. 1, p. 20; Pl. Br. 3–4 (citing Ex. 4). On January 4, 2022, the Plaintiff called the Defendant and again received confirmation that he was paid in full (confirmation number 987141). Ex. 1, p. 16; Pl. Br. 3 (citing Ex. 4); Ex. 2, p. 4. The Plaintiff made a phone payment on January 5, 2022, for $37.23 that paid the premium due to January 13, 2022. Ex. 2, p. 4. A "Billing Notice" was sent to the Plaintiff listing the "date the last payment was received" as "02/07/22," a "Due Date" of "2/13/22" for a "Total Due" of "$37.23," and the statement "This statement reflects all payments credited through: 06/06/22." Ex. 1, p. 28. Another phone payment

was made on February 7, 2022, for $37.23 to pay the premium due February 13, 2022. Ex. 2, p. 4. Based on these communications, the Plaintiff understood that all his premium payments were credited through June 5, 2022. Pl. Br. 4 (citing Ex. 4).

However, on February 13, 2022, the Defendant sent the Plaintiff a check dated 02/13/22 for $74.46 with the description "Insufficient Premium." Ex. 1, p. 22. In a letter dated February 13, 2022 letter, the Defendant wrote, "This correspondence is in regards to a recent lapse notice that the company sent to you. Our records indicate we received payment in an amount that was insufficient to prevent the policy from lapsing. We are refunding this payment to the owner under separate cover." *Id.* at 26. In a short, separate letter also dated February 13, 2022, the Defendant wrote, "We regret to inform you that your universal life insurance policy has been terminated. The entire cash value has been used to pay premiums, and the contract has no further value." *Id.* at 24; *see* Ex. 2, p. 4–5.

On February 25, 2022, the Plaintiff spoke to the Defendant's employee Keri, who apologized for the incorrect communications and stated that the Policy should not have been terminated. Pl. Br. 4 (citing Ex. 4); Ex. 1, p. 26. The Plaintiff asked what his premiums should be, and he was informed he would receive by mail an invoice reflecting what was owed. Pl. Br. 4 (citing Ex. 4).

The Plaintiff received a "Billing Notice" with the "date the last payment was received" as "02/07/22" for "$37.23," a "Due Date" of "3/13/22" for the "Total Due" of "$37.23," and the statement: "This statement reflects all payments credited through: 06/07/22." Ex. 1, p. 30. Another "Billing Notice" with the "date the last payment was received" of "02/07/22" shows a "Due Date" of "05/13/22" for the "Total Due" of "$37.23" and the statement: "This statement reflects all payments credited through: 06/09/22." Ex. 1, p. 32.

In early May 2022, the Plaintiff contacted an attorney with concerns about his insurance premiums, and on May 13, 2022, the Plaintiff's attorney sent the Defendant a letter by certified mail requesting clarification as to the termination of the Policy, its reopening, and the failure to send invoices; asserting that the Defendant "involuntarily used accumulated cash value to pay unknown fees"; and requesting various documents as well as "the whereabouts of why and to whom the gross cash accumulated cash has gone." Ex. 2, p. 1; Pl. Br. 4 (citing Ex. 4).

On June 6, 2022, the Defendant responded by letter, explaining how the flexible premium adjustable life insurance policy functions. Ex. 2, pp. 3–5. The Defendant explained that the Plaintiff had selected a monthly billing notice with a premium of $37.23 per month; that if a policyholder's monthly premium contributes less than the cost of insurance plus the policy administrative fees and expense charges, the shortage is deducted from the accumulated cash value, thus reducing the cash value; that the cost of insurance increases each year on the anniversary date of October 13; that the policy must maintain a continuous cash value that is equal to or greater than the amount of all monthly deductions; and that if there is not enough cash value to cover those deductions, the policy enters the grace period. *Id.* at 3. In the letter, the Defendant acknowledged the Plaintiff's February 25, 2022 inquiry about reinstating the policy, and wrote: "A reinstatement letter is enclosed and provides the requirements needed to be considered for reinstatement of the policy. We sincerely apologize for the delay in providing the reinstatement information to [the Plaintiff]." *Id.* at 5.

In early June 2022, the Plaintiff received a Billing Notice with the "date the last payment was received" of "09/21/22" in the amount of "$570.75," a "Due Date" of "06/13/22" with a "Total Due" of "$37.23," and the statement: "This statement reflects all payments credited through: 09/21/22." Ex. 1, p. 34.

On June 20, 2022, the Plaintiff's attorney requested further clarification regarding the overage payments by the Plaintiff and requesting that future invoices state the amount owed to keep the policy current rather than the flat monthly amount of $37.23. Ex. 2, pp. 41–42.

On July 26, 2022, the Defendant responded, advising that the Plaintiff's policy would be reinstated without an underwriting review if "the back premium to pay the policy is received." Ex. 2, p. 44. The Defendant again explained how the flexible premium adjustable life insurance policy functions. *Id.* at 44–45. The Defendant quoted the Policy provision: "It is possible that coverage will expire prior to the maturity date chosen when either no premiums are paid following payment of the initial premium or subsequent premiums are insufficient to continue to such date." *Id.* at 45. The Defendant explained, "Because this is a flexible premium product, the policy owner must notify the company if he/she wishes to change the billed amount. Until that time, the company will send billing notices for the last amount requested by the policy owner." *Id.* The Defendant then cited the Policy provision on "Premium Payment" providing that "[a]ny time before the Maturity Date, you may: (a) change the amount and/or the frequency of the Planned Periodic Premiums; and (b) pay additional premiums." *Id.* The Defendant explained:

> A Monthly Charge for the Cost of Insurance, the cost of additional benefits provided by riders, and the Per Thousand Expense Charges multiplied by the number of thousands of Initial Face amount or increase in face amount, and the Per Policy Expense Charge (Policy Page 7) are deducted from the policy cash value.

> If a policyholder's monthly premium payment exceeds the combined total of all monthly charges the excess funds will be added to the Cash Value (Policy Page 6) and will earn interest at the current interest rate. However, if the premium payment is less than the Monthly Charge, any shortage is taken from the cash value thus reducing it. The policy must maintain a continuous cash value that is equal to or greater than the amount of all monthly charges.

> As explained in our response on June 6, 2022, the cost of insurance increases every year on the policy anniversary date. A table of Monthly Guaranteed Cost of Insurance Rates is provided in the policy. This information is also included with the Annual Report of Financial Values.

We will notify the policyholder if the premium is not sufficient to pay the monthly charges by sending a grace period notice.

Grace Period, Policy Page 5:

> GRACE PERIOD
>> If the Net Cash Value (Cash Value minus Loan Balance and any applicable Surrender Charge) on a Monthly Anniversary Day will not cover the Monthly Charge, the Policy will remain in force for a Grace Period of 61 days.
>> If a premium sufficient to cover the Monthly charge then due and the next Monthly Charge are not paid by the end of the Grace Period, your Policy will terminate without value. We will mail you notice of the required premium when the Net Cash Value becomes insufficient. If the Insured dies within the Grace Period, the Death Benefit will be reduced by the amount of the then required premium.

*To maintain the coverage Mr. Potts will need to increase the premium to an amount sufficient to cover the monthly charges going forward. We would be pleased to provide Mr. Potts with an illustration to project future values based on additional premium payments and guaranteed values*. Keep in mind, an illustration is not a guarantee of future values. *Mr. Potts should contact us at the number provided below to request an illustration after he has submitted payment to reinstate the policy*.

Based on our review, Transamerica mailed information to Mr. Potts to keep him informed of the premium needed to avoid a lapse in coverage, and according to the terms and conditions of the policy.

*Id.* at 45–46 (emphasis added).

The Defendant informed the Plaintiff by letter dated July 26, 2022, that "[i]n order to review this reinstatement we will need . . . [a] payment of $762.86," which consisted of a $192.11 grace payment and $570.75 to pay the policy to October 13, 2022. Ex. 1, p. 36; *see also* Ex. 5, 41:4–24. The letter provided, "Since the planned premium is less than the estimated cost of insurance, please request an updated illustration once the policy is back in force to determine premium amount needed to keep the policy and benefit." Ex. 1, p. 36; *see also* Ex. 5, 44:1–9. The Plaintiff wrote a check for $762.86 dated August 16, 2022. Ex. 1, p. 37. The Plaintiff sent a

letter with the August 16, 2022 check that stated: "Please find enclosed our monthly payment as per your invoices for the attached policy number. Please advise if any additional monies are necessary, to ensure that this policy is in continuance to ensure that we are paying the proper amount to keep the policy active and in benefits." Ex. 3, ECF No. 48-3; Pl. Br. 5 (citing Ex. 4). The Plaintiff did not receive a response. Pl. Br. 5 (citing Ex. 4). The check was deposited by the Defendant on August 22, 2022. *See id.*

In a letter dated September 19, 2022, the Defendant wrote to the Plaintiff, "We regret to inform you that your universal life insurance policy has been terminated. The entire cash value has been used to pay premiums, and the contract has no further value. . . . Please let us know if we can help you to reinstate this valuable insurance protection." Ex. 1, p. 39. This shocked the Plaintiff because he had paid $762.86, which was to keep his policy current through October 13, 2022. Pl. Br. 5 (citing Ex. 4).

A month later, in a letter dated October 15, 2022, titled "Notice of Payment Due," with the notation "Important – Final Notice," the Defendant informed the Plaintiff:

> Your life insurance has entered its grace period and is in danger of lapsing. In order to prevent your policy from lapsing, we must receive a minimum payment of $34.02 by 12/13/2022.
>
> If we don't receive the minimum payment by this date, your policy will lapse and any and all benefits or payments provide by your policy will be void and forfeited, except for the right to any cash surrender value or nonforfeiture benefit. You'll be notified once your policy has lapsed.
>
> . . .
>
> The grace period and the date of lapse can't be extended with a partial payment of if your payment doesn't go through for any reason. This notice supercedes[sic] any billing notices sent previously. Please let us know if you have any questions about how much is due.

Ex. 1, p. 41.

In a short letter dated December 13, 2022, the Defendant wrote to the Plaintiff: "We regret to inform you that your universal life insurance policy has been terminated. The entire cash value has been used to pay premiums, and the contract has no further value. . . . Please let us know if we can help you reinstate this valuable insurance protection." Ex. 1, p. 43.

The Plaintiff states that he never received any written or verified communication from the Defendant, other than the monthly invoices, outlining what other monthly premium amount he was to pay for his Policy. Pl. Br. 5 (citing Ex. 4).

## DISCUSSION

The Defendant moves for summary judgment on the remaining two Counts of the Complaint. The Court considers each in turn.

### A.      Breach of Contract (Count I)

The Complaint makes the following factual allegations. In Spring 2022, the Plaintiff received notices from the Defendant that coverage would be terminated unless additional payments were remitted and that, in Spring 2022, he remitted additional payments, only to have the Policy terminated. In Summer 2022, the Plaintiff received a communication from the Defendant, which indicated the Policy had been reinstated and requested additional payment to maintain the Policy effective through October 2022, and the Plaintiff paid the requested amount. However, in November 2022, the Plaintiff received a notification that the Defendant was again terminating his Policy. In Count I of the Complaint, the Plaintiff alleges that he timely made payments and additional payments as invoiced by the Defendant and in accordance with the Policy yet the Defendant terminated the Policy "without cause." Compl. ¶¶ 12, 13.

Under Indiana law, "[t]he essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Berg v. Berg*, 170 N.E.3d

224, 231 (Ind. 2021) (citation omitted).[5] "Insurance policies are contracts 'subject to the same

rules of judicial construction as other contracts.'" *Erie Indem. Co. v. Est. of Harris*, 99 N.E.3d

625, 630 (Ind. 2018) (quoting *State Farm Mut. Auto Ins. v. Jakubowicz*, 56 N.E.3d 617, 619 (Ind.

2016)). The meaning of a contract is a pure question of law. *Jakubowicz*, 56 N.E.3d at 619

(citation omitted). "When confronted with a dispute over the meaning of insurance policy terms,

Indiana courts afford clear and unambiguous policy language its plain, ordinary meaning." *Estate

of Harris*, 99 N.E.3d at 630 (citation omitted). Policy language is unambiguous "if reasonably

intelligent policyholders could not legitimately disagree as to what the policy language means."

*Id.* "Where there is ambiguity, insurance policies are construed strictly against the insurer, and

the policy language is viewed from the standpoint of the insured." *Jakubowicz*, 56 N.E.3d at 619

(citation omitted).

The Defendant moves for summary judgment on the basis that it complied with all Policy

requirements regarding the Plaintiff's failure to keep the Policy in value. The Defendant argues

that the Policy language is clear—the Plaintiff was required to remit certain payments or risk

losing coverage. The Defendant contends that, when the Plaintiff was warned that the Policy was

in a grace period and in jeopardy of termination, the Plaintiff did not make sufficient payments

and the Policy terminated in February 2022 in accordance with the plain language of the Policy.

The analysis in the Defendant's motion stops with the events leading to the February

2022 termination of the Plaintiff's Policy despite the allegations of the Complaint basing the

breach of contract claim on all the events through the subsequent termination of the Policy in

November 2022. And the Defendant's reply brief offers no substantive response to the evidence

---

[5] The parties do not dispute that Indiana substantive law applies in this diversity case. *RLI Ins. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.").

produced in support of the Plaintiff's response brief to raise a genuine dispute of fact whether the Defendant complied with Policy provisions to mail "notice of the required premium when the Net Cash Value becomes insufficient" once the Policy enters a "grace period," whether the Defendant terminated the Policy notwithstanding sufficient payment by the Plaintiff in August 2022, and whether the Defendant provided the Plaintiff with the requested information necessary to pay a premium sufficient to maintain the required cash value.

The Defendant is correct that it is undisputed that the Plaintiff testified that he did not understand how the flexible premium adjustable life insurance policy functions; that in 2021, the Plaintiff did not make a sufficient premium payment, notwithstanding his regular monthly payment of $37.23, to pay the monthly cost of insurance once the cash value of the Policy was insufficient to pay the monthly charge; that it was the Plaintiff's responsibility to increase his monthly premium to a level to keep a cash value sufficient to cover the cost of insurance; and that the Plaintiff did not increase his monthly premium of $37.23 that had been set in 1990 when the Policy was purchased.

However, it is also undisputed that the Defendant's employee told the Plaintiff on February 25, 2022, that the Policy should not have been terminated in February 2022. And, in its June 6, 2022 response letter to the Plaintiff's attorney, the Defendant recognized that the Plaintiff had requested reinstatement of the Policy in February and apologized for the delay (more than three months) in providing the necessary information for the Plaintiff to make a payment to reinstate the Policy. The evidence shows that the Plaintiff made that payment of $762.86 by check, deposited by the Defendant on August 22, 2022, which should have been sufficient to keep the Policy in value through October 13, 2022. Yet to his shock, the Plaintiff received a letter from the Defendant dated September 19, 2022, that his Policy had been terminated as the

entire cash value had been used to pay premiums, leaving the contract with no value. Then, in an October 15, 2022 letter, the Plaintiff received a grace period letter informing him that the Policy had entered its grace period and that to prevent it from lapsing, a minimum payment of $34.02 was due by December 13, 2022. And, in a letter dated December 13, 2022, the Defendant informed the Plaintiff that the Policy had been terminated because the remaining cash value had been used to pay premiums.

On several occasions, beginning a year earlier in November 2021, the Plaintiff asked for information from the Defendant to calculate an increased premium payment, but the Defendant did not respond. The July 26, 2022 letter from the Defendant inviting that catch-up payment of $762.86 provided, "Since the planned premium is less than the estimated cost of insurance, please request an updated illustration once the policy is back in force to determine premium amount needed to keep the policy and benefit." The Plaintiff requested the information in writing in August 2022 when he made the $762.86 payment but received no response from the Defendant. The Defendant has offered no explanation on the instant motion for not providing the Plaintiff with the requested illustration or for not responding to his requests regarding increasing his premium payment. Given the Defendant's earlier failure to timely provide the Plaintiff with the reinstatement information requested in February 2022 until contacted by the Plaintiff's attorney, it is reasonable to infer that the Defendant failed to provide the Plaintiff with the information he requested in August 2022. In addition, the Defendant offers no explanation for the Billing Notices with due dates in December 2021, January 2022, and February 2022 that show payments through June 2022 with last payments "received" on a future date in September 2022.

On the record before the Court, the Plaintiff has raised genuine disputes of material fact both as to whether the Defendant breached the Policy in September 2022 when it sent him the termination notice notwithstanding the Plaintiff's payment of the required $762.86 to bring the Policy current through October 13, 2022, and when it failed to provide the information the Plaintiff requested necessary for the Plaintiff to increase his premium payments to a sufficient level to maintain cash value. While the facts may ultimately show that the Plaintiff's premium and catch-up payments in July to December 2022 were insufficient to maintain the necessary cash value as required by the terms of the Policy, that the Defendant provided the Plaintiff with the requisite notices and requested information, and that the Policy was terminated after lapsing for insufficient cash value, the Defendant has not offered that evidence on the instant motion. The Court denies the Defendant's Motion for Summary Judgment on Count I.

**B.    Bad Faith**

In Count III of the Complaint, the Plaintiff alleges that the Defendant had a duty to deal with the Plaintiff in good faith but that the Defendant violated the duty by "[f]raudulent[ly] demanding additional sums of payment to maintain good standing of the policy," "[u]pon receipt of monies demanded, on multiple occasions terminating the Policy," and "[u]pon terminating the Policy, then seeking to reinstate and promising to maintain the Policy for a period of time, only to terminate the Policy again upon receipt of additional funds."

Under Indiana law, there is "a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured." *Erie Ins. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993) (cleaned up). "To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability." *Freidline v. Shelby Ins.*, 774 N.E.2d 37, 40 (Ind. 2002) (citation omitted). "An Indiana bad faith

claim generally requires 'evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will.'" *Wood v. Allstate Ins.*, No. 3:11-CV-128, 2012 WL 6553000, at *5 (N.D. Ind. Dec. 14, 2012) (quoting *Monroe Guar. Ins. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005)). "Poor judgment and negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present." *Colley v. Ind. Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998); *see Thorne v. Member Select Ins.*, 899 F. Supp. 2d 820, 826 (N.D. Ind. 2012) (citing *Monroe Guar. Ins.*, 829 N.E.2d at 977; *Colley*, 691 N.E.2d at 1261).

The Defendant argues that the Plaintiff has offered no allegations, much less evidence, regarding the Defendant's motivation and purpose in terminating the Policy. The Defendant argues that the Plaintiff has offered "nothing better than speculation." *Wood*, 2012 WL 6553000, at *6. The Defendant argues that the Policy was terminated because the Plaintiff failed to make timely, sufficient payments—a far cry from "moral obliquity" or "ill will." In response, the Plaintiff offers no evidence of the Defendant's state of mind. Rather, the Plaintiff argues, with no citation to law, that the Defendant's bad faith is shown by the termination of the Policy in February 2022 even though the Plaintiff had made the payments requested in the Billing Notices, the Defendant's apology for the error in terminating the Policy in February 2022, the issuance of Billing Statements showing a payment made months in the future, and the termination of the Policy in September 2022 even though the Policy was paid through October 13, 2022. These are not facts from which a reasonable jury could find that the Defendant acted with dishonest purpose, moral obliquity, furtive design, or ill will. *See Lummis v. State Farm Fire & Cas. Co.*, 469 F.3d 1098, 1100 (7th Cir. 2006) (applying Indiana law); *Hickman*, 622 N.E.2d at 520 (recognizing that "[t]he lack of diligent investigation alone is not sufficient to support an award"

24

for a breach of the duty of good faith in the insurance context); *Freidline*, 774 N.E.2d at 40; *Erie Ins. Exch. v. Craighead*, 192 N.E.3d 195, 204 (Ind. Ct. App. 2022) (finding a genuine issue of material fact where the insurance company refused to pay the undisputed portion of uninsured motorist coverage without a release by the plaintiff on the disputed portion); *Allstate Ins. v. Fields*, 885 N.E.2d 728, 732–34 (Ind. Ct. App. 2008). The Court grants summary judgment for the Defendant on the bad faith claim in Count III.

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS in part and DENIES in part Transamerica's Renewed Motion for Summary Judgment [ECF No. 44]. The Court grants summary judgment for the Defendant on the bad faith claim in Count III and denies summary judgment on the breach of contract claim in Count I. Thus, this case remains pending on Count I of the Plaintiff's Complaint.

Pursuant to 28 U.S.C. § 636, this case is REFERRED to Magistrate Judge Abizer Zanzi for purposes of holding a settlement conference.

So ORDERED on June 27, 2025.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT